Slip Op. 20-188

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **PLEXUS CORP.**, | |
| Plaintiff, | |
| **v.** | **Before: Timothy M. Reif, Judge** |
| | **Court No. 13-00343** |
| **UNITED STATES**, | |
| Defendant. | |

## OPINION

[Granting defendant's motion to dismiss as to one entry for lack of subject matter jurisdiction, denying plaintiff's Rule 56 motion for summary judgment and denying defendant's Rule 56 cross-motion for summary judgment, granting partial summary judgment on the issues addressed below, and directing the parties to submit within 30 days of the date of this opinion a proposed scheduling order that includes (1) a date for submission of the order governing preparation for trial, (2) a date for the submission of the pretrial order, (3) a date for the pretrial conference, and (4) a proposed trial date on or before March 1, 2021, on the issue of the principal use of the subject merchandise.]

Dated:  December 22, 2020

<u>Myron P. Barlow</u>, Barlow & Company, LLC, of Washington, DC, argued for plaintiff Plexus Corp.

<u>Beverly A. Farrell</u>, Trial Attorney, Civil Division, Commercial Litigation Branch, U.S. Department of Justice, of New York, NY argued for defendant United States.  With her on the brief were <u>Joseph H. Hunt</u>, Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, Commercial Litigation Branch and Offices of Foreign Litigation and International Legal Assistance, and <u>Justin R. Miller</u>, Attorney-in-Charge, International Trade Field Office.  Of Counsel was <u>Michael W. Heydrich</u>, Office of the Assistant Chief Counsel, International Trade Litigation, United States Customs and Border Protection.

Reif, Judge: At issue in this case is the correct classification of printed circuit board assemblies ("PCBAs") and chassis imported into the United States by plaintiff Plexus Corp. ("Plexus" or "plaintiff"). Before the court are cross-motions for summary judgment and defendant's motion to dismiss as to one entry for lack of subject matter jurisdiction. *See* Pl.'s Mot. for Summ. J., ECF No. 42 ("Pl. Br."); Def.'s Cross-Mot. for Summ. J. and Mot. to Diss., ECF No. 53 ("Def. Br."); *see also* Pl.'s Reply & Resp. to Def. Cross-Mot. for Summ. J. & Resp. Consent. to Def.'s Mot. to Diss., ECF No. 61 ("Pl. Rep. Br."); Def.'s Reply in Supp. of Cross-Mot. for Summ. J., ECF No. 66 ("Def. Rep. Br."). Plaintiff challenges a decision by United States Customs and Border Protection ("Customs" or "defendant") to classify the PCBAs and chassis under subheadings 8529.90.13 and 8529.90.83, respectively, of the Harmonized Tariff Schedule of the United States ("HTSUS").[1] Subheading 8529.90.13 covers "Parts suitable for use solely or principally with the apparatus of headings 8525 to 8528: Other: Printed Circuit assemblies: Of television apparatus: Other: Other" and carries a 2.9% *ad valorem* duty. Subheading 8529.90.83 covers "Parts suitable for use solely or principally with the apparatus of headings 8525 to 8528: Other: Other parts of articles of headings 8525 and 8527: Of television apparatus: Other" and carries a 2.9% *ad valorem* duty. In reaching this classification, Customs first determined that the subject merchandise is used as constituent parts in the finished merchandise described in Heading 8525, which

---

[1] All citations to the HTSUS, including Chapter Notes and General Notes, are to the 2012 edition, as the relevant HTSUS provisions remained identical from 2010 to 2012, during which time Plexus entered the subject merchandise.

includes "transmission apparatus for radio-broadcasting or television." *See* Customs'

Headquarters Ruling Letter ("HQ") H193879 (Jun. 5, 2013) (Def. Ex. 1) at 11.

Plaintiff argues that the correct classification of the products is under subheading

8517.70.00, which covers "Telephone sets, including telephones for cellular networks or

for other wireless networks; other apparatus for the transmission or reception of voice,

images or other data, including apparatus for communication in a wired or wireless

network (such as a local or wide area network), other than transmission or reception

apparatus of heading 8443, 8525, 8527 or 8528; parts thereof: Parts" and is duty free.

The question presented is whether the imported items are "[p]arts" under

Heading 8529 "suitable for use solely or principally with" "[t]ransmission

apparatus for radio-broadcasting or television" under Heading 8525, or parts for

"other apparatus for the transmission . . . of voice, images or other data . . . "

under Heading 8517.

The court determines, as elaborated below, that factual issues regarding the

principal use of the subject merchandise remain unresolved.  Consequently, the court

does not reach a conclusion as to whether the proper classification of the subject

merchandise is Heading 8529, which is comprised of parts suitable for use solely or

principally with the apparatus of Heading 8525, or Heading 8517.  Accordingly, plaintiff's

motion for summary judgment and defendant's cross-motion for summary judgment

must be denied.  Rather, the court grants partial summary judgment in favor of

defendant on issues relating to the proper meaning of the terms in Heading 8517, and

Headings 8525 and 8529.  Partial summary judgment is denied for defendant in all other

respects.

Defendant also moves to dismiss all claims relating to Entry No. UPS-8221052-5, alleging that the claims are based on an untimely, and, therefore, invalid, protest.  For the reasons set out below, the court grants defendant's motion to dismiss as to Entry No. UPS-8221052-5.

## BACKGROUND

### I.    The Imported Merchandise

USCIT Rule 56(a) requires that the court grant summary judgment if a moving party can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Movants should present material facts as short and concise statements, in numbered paragraphs and cite to "particular parts of materials in the record" as support.  USCIT Rule 56(c)(1)(A).  The opponent must, in response, "include correspondingly numbered paragraphs responding to the numbered paragraphs in the statement of the movant."  USCIT Rule 56.3(b).

The parties submitted separate statements of facts with their respective summary judgment motions.  *See generally* Pl.'s Statement of Material Facts as to Which There Are No Genuine Issues to be Tried, ECF No. 54-1 ("Pl. Stmt. Facts"); Def.'s Statement of Material Facts as to Which There Are No Genuine Issues to be Tried, ECF No. 53-14 ("Def. Stmt. Facts").  The majority of the responses to plaintiff's and defendant's statements, respectively, were admissions, but many responses included additional claims.  *See generally* Def.'s Response to Pl.'s Statement of Material Facts, ECF No. 57 ("Def. Resp. Pl. Stmt. Facts"); Pl.'s Response to Def.'s Statement of Material Facts, ECF No. 61-3 ("Pl. Resp. Def. Stmt. Facts").  Upon the court's review of the parties' respective statements of facts and supporting documents, the court determines that the

following material facts regarding the subject merchandise and the Harmonic EMRs are undisputed.

From 2010 to 2012, plaintiff imported the subject merchandise into the United States through ports in California, Washington, Ohio and Kentucky. Pl. Br. at 6; Def. Br. at 1-2. There were 392 entries covered by 32 protests. Def. Br. at 1. The subject articles are printed circuit board assemblies (PCBAs) and chassis, used in encoders, multiplexers and remultiplexers designed and marketed by Harmonic, Inc. ("Harmonic EMRs"). Joint Stmt. Facts ¶¶ 1, 2, 5, 6. Harmonic, Inc. ("Harmonic") and Plexus entered into a contract under which Plexus manufactured products designed and marketed by Harmonic. *Id.* ¶ 1. Based on Section XVI, Note 2(b) of the HTSUS, discussed *infra*, proper classification of the PCBAs and chassis depends on the classification of the machines with which they are used.

The subject PCBAs and chassis are used in Harmonic EMRs that are identified by the following model names and numbers: Audio Encoder (encoder), DiviCom Electra 1000 (encoder), DiviCom Electra 5000 (encoder), DiviCom Electra 5400 (encoder), DiviCom Electra 7000 (encoder), DiviCom Electra 8000 (encoder), DiviCom Ion (encoder), ProStream 1000 (multiplexer), ProStream 1000 with ACE (remultiplexer). *Id.* ¶ 10. The function of encoders is to compress audio and video digital data representing images and sound, including voice. *Id.* ¶ 11. Encoders are used so that the data that are compressed by the encoder occupy less space in storage and less bandwidth during transmission. *Id.* ¶ 12. The data output from the Harmonic encoders goes to switches and routers and/or to multiplexers. *Id.* ¶ 13. Multiplexers take output data from multiple encoders and combine them into a single stream so that more data can be

transmitted with the available bandwidth.  *Id.* ¶14.  Remultiplexers fulfill an identical purpose for data from multiple multiplexers.  *Id.* ¶ 15.

Harmonic EMRs are not necessary for the transmission of a data signal.  Pl. Stmt. Facts ¶ 20; Def. Resp. Pl. Stmt. Facts ¶ 20.  However, Harmonic customers could not provide data signals in a cost-effective manner without the use of Harmonic EMRs. Transcript of Oral Argument ("Tr. Oral Arg.") at 72-73.  The Harmonic EMRs do not themselves send signals to reception devices for listening and viewing by people; however, they are used in the networks that send signals out to viewing devices for listening and viewing.  Pl. Stmt. Facts ¶ 19; Def. Resp. Pl. Stmt. Facts ¶ 19.  A DICTIONARY OF COMPUTER SCIENCE (7th ed. 2016) defines "network" as a "system that consists of terminals, nodes, and interconnection media that can include lines or trunks, satellites, microwave, medium- and long-wave radio, etc.  In general, a network is a collection of resources used to establish and switch communication paths between its terminals."

Harmonic EMRs are used in communication networks and networks that may be configured as public switched telephone networks, local area networks, metropolitan area networks and wide area networks.  Pl. Stmt. Facts ¶ 18; Def. Resp. Pl. Stmt. Facts ¶ 18.  Data compressed by Harmonic EMRs may be heard through and viewed on smartphones, personal computers and other devices in addition to television screens. Pl. Stmt. Facts ¶ 21; Def. Resp. Pl. Stmt. Facts ¶ 21.  The data that are compressed and multiplexed by Harmonic EMRs may consist of video conferencing and audio-video content other than television or radio programming.  Pl. Stmt. Facts ¶ 21; Def. Resp. Pl. Stmt. Facts ¶ 21.

The compression that Harmonic EMRs perform is "[p]rimarily about reducing the bandwidth of video, the amount of space it would occupy on a storage device or the amount of bandwidth it would occupy as the video is transmitted for a T.V. service." Def. Stmt. Facts ¶ 20 (citing Def. Ex. 3 (Deposition of Eric Armstrong) ("Armstrong Dep.") at 18). Plaintiff notes that the data compression function of Harmonic EMRs may be used also in the transmission of data for non-television and non-radio content. Pl. Resp. Def. Stmt. Facts ¶ 20.

Harmonic EMRs are not necessary for the transmission of a data signal, Pl. Stmt. Facts ¶ 20, but "permit the delivery of the best possible quality for the minimal bandwidth thereby saving money and reducing expenses in providing channels for viewing." Def. Resp. Pl. Stmt. Facts ¶ 20. For this reason, purchasers of Harmonic EMRs would not provide data signals without them. Tr. Oral Arg. at 71-73.

Harmonic EMRs do not actually transmit the signal to the final receiving device (such as a television); they are part of the chain of equipment that allows for transmission of the signal. Pl. Stmt. Facts ¶ 19; Def. Resp. Pl. Stmt. Facts ¶ 19.

## II. Subject Matter Jurisdiction

This Court has jurisdiction under 28 U.S.C. § 1581(a) (2012), which provides that "[t]he Court of International Trade shall have exclusive jurisdiction of any civil action commenced to contest the denial of a protest, in whole or in part, under 19 U.S.C. § 1515." The Court's determination of subject matter jurisdiction is a threshold inquiry. *Steel Co. v. Citizens For A Better Environment*, 523 U.S. 83, 94-95 (1998). "It is fundamental that the existence of a jurisdictional predicate is a threshold inquiry in which plaintiff bears the burden of proof." *CR Industries v. United States*, 10 CIT 561,

562 (1986).  "When a federal court concludes that it lacks subject-matter jurisdiction, the court must dismiss the [claim] in its entirety."  *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006).

Plexus brought this this action on October 4, 2013 by filing a complaint that covered 392 entries.  Plexus claims that the court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(a).  Compl. ¶ 1, ECF No. 5.  Under section 1581(a), this Court has "exclusive jurisdiction of any civil action commenced to contest the denial of a protest, in whole or in part," pursuant to 19 U.S.C. § 1515.  Section 1515 requires an aggrieved party to file a protest under 19 U.S.C. § 1514.

Pursuant to 19 U.S.C. §§ 1514(a) and 1514(c)(3), certain decisions of Customs become final and conclusive as to all persons unless a protest is filed within 180 days after the date of liquidation.  "The court lacks jurisdiction over protests that do not satisfy the requirements of 19 U.S.C. § 1514(c)(1) and 19 C.F.R. § 174.13(a)."  *Koike Aronson, Inc. v. United States*, 165 F.3d 906, 908 (Fed. Cir. 1999).  Therefore, a prerequisite to this Court's jurisdiction is a timely-filed protest — specifically, one filed within 180 days of liquidation.

Defendant objects to the court's subject matter jurisdiction over Entry No. UPS-8221052-5, because the protest covering this entry was filed more than 180 days after liquidation.  *See* Def. Mot. to Dismiss, ECF No. 53.  The entry was liquidated on March 18, 2011; however, the protest covering this entry was filed on September 19, 2011, 185 days later.  *See* Def. Ex. 2 (Protest No. 2720-11-100481).  A valid protest was not

timely filed for this entry so the court lacks subject matter jurisdiction for the entry.[2]
Therefore, plaintiff's claim as to this entry is dismissed.

The protests for the other 391 entries were timely filed and the timeliness of
those entries has not been disputed by defendant.  Def. Br. at 2.

## STANDARD OF REVIEW

The court will grant summary judgment if "the movant shows that there is no
genuine dispute as to any material fact and the movant is entitled to judgment as a
matter of law."  USCIT Rule 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S.
242, 247 (1986).  In considering whether material facts are in dispute, the court must
consider evidence in the light most favorable to the non-moving party, drawing all
reasonable inferences in its favor.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157
(1970); *Anderson*, 477 U.S. at 261 n.2.  When, as here, cross-motions for summary
judgment are before the court, "each party carries the burden on its own motion to show
entitlement to judgment as a matter of law after demonstrating the absence of any
genuine disputes over material facts."  *Am. Fiber & Finishing, Inc. v. United States*, 39
CIT ___, ___, 121 F. Supp. 3d 1273, 1279 (2015) (quoting *Massey v. Del Labs.*, 118
F.3d 1568, 1573 (Fed. Cir. 1997)).  "A genuine factual dispute is one potentially
affecting the outcome under the governing law."  *Anderson*, 477 U.S. at 248.

"The court may not resolve or try factual issues on a motion for summary
judgment."  *Phone-Mate, Inc. v. United States*, 12 CIT 575, 577, 690 F. Supp. 1048,

---

[2]  In plaintiff's Reply Brief, plaintiff consents to defendant's motion to dismiss this entry.
Pl. Rep. Br. at 4 ("Plaintiff agrees that entry number UPS-8221052-5 should be
dismissed for lack of jurisdiction because it was protested more than 180 days after
liquidation.").

1050 (1988) (citation omitted), *aff'd*, 867 F.2d 1404 (Fed. Cir. 1989).  Further, "summary judgment in a classification case is appropriate only if 'the material facts of what the merchandise is and what it does are not at issue.'"  *Roche Vitamins, Inc. v. United States*, 34 CIT 1553, 1557, 750 F. Supp. 2d 1367, 1372 (2010) (citing *Diachem Indus. Ltd. v. United States*, 22 CIT 889, 892 (1998)).

The Court reviews classification cases *de novo*, *see* 28 U.S.C. § 2640(a)(1), and on "the basis of the record made before the court."  *Id.* § 2640(a).

"The plaintiff has the burden of establishing that the government's classification of the subject merchandise was incorrect . . . ."  *Lerner New York, Inc. v. United States*, 37 CIT 604, 607, 908 F. Supp. 2d 1313, 1317-18 (2013).  "[Plaintiff] does not bear the burden of establishing the correct classification; instead, it is the court's independent duty to arrive at 'the correct result' . . . ."  *Id*. (citations omitted).

"The ultimate question in a classification case is whether the merchandise is properly classified under one or another classification heading," which is "a question of law."  *Bausch & Lomb v. United States*, 148 F.3d 1363, 1365 (Fed. Cir. 1998).  Every new entry of goods into the United States constitutes a new cause of action because every classification involves both the interpretation of the relevant statute as well as questions of fact regarding the merchandise.  *United States v. Mercantil Distribuidora, S.A.*, 45 CCPA 20, 23-24, C.A.D. 667 (1957).

Merchandise is to be classified based on the condition in which it is imported.  *See Mita Copystar Am. v. United States*, 21 F.3d 1079, 1082 (Fed. Cir. 1994).  A two-step process guides the court in determining the proper classification of merchandise.  *Sports Graphics, Inc. v. United States*, 24 F.3d 1390, 1391 (Fed. Cir. 1994).  First, the

court must "ascertain[] the proper meaning of specific terms within the tariff provision." *BenQ America Corp. v. United States*, 646 F.3d 1371, 1376 (Fed. Cir. 2011).  This is a question of law.  Second, the court must determine "whether the merchandise at issue comes within the description of such terms as properly construed."  *Id.*  This is a question of fact.  "[W]hen there is no dispute as to the nature of the merchandise, then the two-step classification analysis 'collapses entirely into a question of law.'"  *Link Snacks, Inc. v. United States*, 742 F.3d 962, 965–66 (Fed. Cir. 2014) (quoting *Cummins Inc. v. United States*, 454 F.3d 1361, 1363 (Fed. Cir. 2006)).  In this case, there are material facts in dispute such that summary judgment is not appropriate.  *See Bausch & Lomb*, 148 F.3d at 1365 (holding summary judgment is proper only "when there is no genuine dispute as to the underlying factual issue of exactly what the merchandise is."). *Cf. Jedwards Int'l, Inc. v. United States*, 40 CIT ___ , ___, 161 F. Supp. 3d 1354, 1357 (2016) ("This is such a case, and summary judgment is appropriate.").

## LEGAL FRAMEWORK

The HTSUS is codified at 19 U.S.C. § 1202 and has the force of statutory law. *Aves. In Leather, Inc. v. United States*, 423 F.3d 1326, 1333 (Fed. Cir. 2005).  The General Rules of Interpretation ("GRIs") of the HTSUS govern the proper classification of merchandise entering the United States.  The GRIs "are applied in numerical order." *ABB, Inc. v. United States*, 421 F.3d 1274, 1276 (Fed. Cir. 2005).  The GRIs consist of six rules, but "if an earlier rule resolves the classification question, the court does not look to subsequent rules."  *CamelBak Prods., LLC v. United States*, 649 F.3d 1361, 1364 (Fed. Cir. 2011).

"The HTSUS is designed so that most classification questions can be answered by GRI 1." *Telebrands Corp. v. United States*, 36 CIT 1231, 1235, 865 F. Supp. 2d 1277, 1280 (2012), *aff'd* 522 Fed. Appx. 915 (Fed. Cir. 2013).  GRI 1 states that "classification shall be determined according to the terms of the headings and any relative Section or Chapter Notes."  GRI 1.  Therefore, "a court first construes the language of the heading, and any section or chapter notes in question."  *Orlando Food Corp. v. United States*, 140 F.3d 1437, 1440 (Fed. Cir. 1998).  Pursuant to GRI 1, proper classification of the subject merchandise is in the heading that describes the product at issue completely and specifically.

Absent contrary legislative intent, HTSUS terms are construed according to their common and commercial meanings.  *Len–Ron Mfg. Co. v. United States*, 334 F.3d 1304, 1309 (Fed. Cir. 2003).  When interpreting a tariff term, the court may rely on its own understanding of the term and on secondary sources such as scientific authorities and dictionaries.  *North Am. Processing Co. v. United States*, 236 F.3d 695, 698 (Fed. Cir. 2001) (citing *Carl Zeiss, Inc. v. United States,* 195 F.3d 1375, 1379 (Fed. Cir. 1999)).

For additional direction on the scope and meaning of tariff headings and chapter and section notes, the court may also consult the Explanatory Notes to the Harmonized Commodity Description and Coding System ("ENs"), developed by the World Customs Organization (WCO).  ENs are not legally binding on the court but may be consulted for guidance and are generally indicative of the proper interpretation of a tariff provision. *Degussa Corp. v. United States,* 508 F.3d 1044, 1047 (Fed. Cir. 2007) (citing *Motorola, Inc. v. United States*, 436 F.3d 1357, 1361 (Fed. Cir. 2006)).  However, "the Explanatory

Case 1:13-cv-00343-TMR Document 71 Filed 12/22/20 Page 13 of 52

Notes are persuasive authority for the court when they specifically include or exclude an item from a tariff heading." *H.I.M./Fathom Inc. v. United States*, 21 CIT 776, 779, 981 F. Supp. 610, 613 (1997); *see also BASF Corp. v. United States*, 30 CIT 227, 232, F. Supp. 2d 1200, 1205 (2006), *aff'd*, 497 F.3d 1309 (Fed. Cir. 2007).

Similarly, opinions published by the WCO may also provide guidance. A WCO opinion is not binding and is entitled, at most, to "respectful consideration." *Cummins*, 454 F.3d at 1366. It is not a proxy for independent analysis. *Id*.

## DISCUSSION

### I. Competing Tariff Provisions

The HTSUS does not provide a specific classification for the subject merchandise, *viz*., PCBAs and chassis imported by Plexus. Pl. Br. at 22. As stated by defendant, based on Section XVI, Note 2(b) of the HTSUS, "the proper classification of the PCBAs and chassis hinges on the classification of the encoders, multiplexers and remultiplexers with which they are used." Def. Br. at 4.

Section XVI, Note 2(b) provides:

2. Subject to note 1 to this section, note 1 to chapter 84 and to note 1 to chapter 85, parts of machines (not being parts of the articles of heading [sic] 8484, 8544, 8545, 8546 or 8547) are to be classified according to the following rules:
…
(b) Other parts, if suitable for use solely or principally with a particular kind of machine, or with a number of machines of the same heading (including a machine of heading 8479 or 8543) are to be classified with the machines of that kind or in heading [sic] 8409, 8431, 8448, 8466, 8473, 8503, 8522, 8529 or 8538 as appropriate. However, parts which are *equally* suitable for use principally with the goods of headings 8517 and 8525 to 8528 are to be classified in heading 8517.

(Emphasis supplied).  The tariff provisions at issue are Headings 8517 and 8529.  The latter first requires classification as constituent parts for use solely or principally with the apparatus described in Heading 8525.

Heading 8517 provides, in relevant part:

8517   Telephone sets, including telephones for cellular networks or for other wireless networks; **other apparatus for the transmission or reception of voice, images or other data, including apparatus for communication in a wired or wireless network (such as a local or wide area network)**, *other than transmission or reception apparatus of heading* 8443, *8525*, 8527 or 8528; parts thereof:

Telephone sets, including telephones for cellular networks or for other wireless networks:

8517.70        Parts

(Emphasis supplied).  Headings 8525 and 8529, in turn, provide, in relevant parts:

8525   Transmission apparatus for radio-broadcasting or television, whether or not incorporating reception apparatus or sound recording or reproducing apparatus; television cameras, digital cameras and video camera recorders: . . . .

8529   *Parts* suitable for use solely or principally with the apparatus of *headings 8525* to 8528:

8529.90                Other: Printed Circuit Assemblies:    Of television apparatus:

8529.90.13             Other
                       Of radar, radio navigational aid or radio remote control apparatus

8529.90.83             Other

(Emphasis supplied).

In the present case, classification in Heading 8529 first requires classification in Heading 8525, which covers, in relevant part, "Transmission apparatus for radio-broadcasting or television, whether or not incorporating reception apparatus or sound

recording or reproducing apparatus . . . ."  Heading 8517 covers, in relevant part,

"apparatus for the transmission or reception of voice, images or other data, including

apparatus for communication in a wired or wireless network (such as a local or wide

area network)."

## II.   Positions of the Parties

Plaintiff seeks classification of the PCBAs and chassis under subheading

8517.70.00, as "parts" of articles of Heading 8517.  Pl. Br. at 22.  As such, plaintiff

argues that the Harmonic EMRs with which the PCBAs and chassis are used are

properly classified in Heading 8517, rather than in Heading 8525.  *See id.* at 15.

Plaintiff first argues that the term "*transmission apparatus* for radio-broadcasting

or television" in Heading 8525 (emphasis supplied) has a different meaning than the

term "*apparatus for the transmission* or reception of voice, images or other data" in

Heading 8517 (emphasis supplied).  *Id*.  Specifically, plaintiff argues that the former

refers to "equipment that *sends signals out* to radios and televisions," *Id.* (emphasis

supplied), while the latter "includes equipment that performs a function *that is not the*

*sending out of signals but that supports* transmission."  *Id*. (emphasis supplied).  The

distinction, in plaintiff's view, is one between "products that 'transmit,' meaning [they]

send signals to other locations, and products that do not 'transmit' but that do something

that supports transmission."  Pl. Br. at 29-30.  Plaintiff states that it reached this

conclusion "[b]ased upon the common, commercial and technical meaning" of the words

of Heading 8525.  *Id*.

On this basis, plaintiff concludes that the Harmonic EMRs with which the PCBAs

and chassis are used cannot be classified in Heading 8525 because they "do not send

signals to radios or televisions." *Id.* at 15.  Rather, according to plaintiff, the Harmonic

EMRs are properly classified in Heading 8517 "[b]ecause the [Harmonic EMRs] shrink

the size of digital audio video data in order to enhance the storage and eventual

transmission of that [sic] data by other equipment." *Id.*  Classification in Heading 8517

is further supported, plaintiff adds, by the Explanatory Notes and a WCO Classification

Opinion.  *See id.*

Defendant argues that the PCBAs are classifiable in subheading 8529.90.13, and

the chassis are classifiable in subheading 8529.90.83.  *See* Def. Br. at 2.  Classification

at Heading 8529, as urged by defendant, first requires classification of the Harmonic

EMRs in Heading 8525.  Defendant asserts that the common meaning of "transmission

apparatus for television" supports classification of the Harmonic EMRs in Heading 8525.

*See id.* at 13.  According to defendant, "transmission means to convey or transfer

information, signals, or data from one location to another."  *Id.* at 6 (internal citations

omitted).  Because the data signals that enter the Harmonic EMRs "do not reside there

in perpetuity," *id.* at 16, but rather, are "move[d] . . . along the transmission path," the

Harmonic EMRs can be described as "transmission apparatus" within the meaning of

Heading 8525.  *Id.* at 13, 15.  In brief, defendant argues that the scope of "[H]eading

8525 is not limited to a device that is an actual transmitter."  *Id.* at 16.

In addition, defendant argues that the Harmonic EMRs are properly classified in

Heading 8525 because "there is no dispute that [EMRs] are used in the process that

results in the transmission of television programming."  *Id.* at 12.  Moreover, the

exclusion in Heading 8517 of "transmission or reception apparatus of heading . . . 8525"

from Heading 8517 suggests that "when television signal [sic] are involved, heading 8525 controls." *Id.* at 17.

Further, defendant disagrees with plaintiff's proposed interpretation of Heading 8525 as equipment that transmits, and of Heading 8517 as equipment that supports transmission. *See id.* Defendant contends that "as a matter of sentence structure and grammar, a phrase 'transmission apparatus for television' has the same meaning as 'apparatus for the transmission of television.'" *Id.* at 17. Lastly, in addressing plaintiff's arguments, defendant points out that the WCO Classification Opinion to which plaintiff refers is not binding, and that plaintiff's reliance on the Explanatory Notes to bolster its classification argument is misplaced. *See id.* at 18–19.

## III.   Classification of the Subject Merchandise

To assess whether the court may determine the appropriate classification of the subject merchandise, the court first considers six key issues raised by the parties concerning the meaning of Headings 8517 and 8525: (1) the definitions of the terms "transmission," "apparatus" and "television"; (2) the appropriateness of a principal use analysis with respect to the headings at issue; (3) the relevance of Explanatory Note (G) to Heading 8517; (4) the meaning of the 2007 amendments to Heading 8517; (5) Customs' transmission path theory and deference to prior ruling letters; and, (6) the relevance of the Court of Customs and Patent Appeals' decision in *United States v. Ampex Corp.*, 59 CCPA 134, 138, 460 F.2d 1086, 1088 (1972). After determining the answers to these six key issues, the court then turns to the classification issue at hand in light of the meaning of the headings and makes an assessment as to whether there is a genuine dispute as to any material fact. The court concludes that there is and,

therefore, denies plaintiff's Rule 56 motion for summary judgment, denies defendant's Rule 56 cross-motion for summary judgment, and grants partial summary judgment on the issues addressed below.

### A.    Meaning of Headings 8517 and 8525

To understand and apply properly the language of Headings 8517 and 8525, the court begins by defining the terms in each heading.  Both headings contain the words "apparatus" and "transmission"; however, as noted above, the headings use the words differently and the parties dispute the context and meaning of the words in the respective headings.

### 1.    Definitions of Key Terms — Transmission, Apparatus and Television

#### a.    Transmission and Apparatus

The court begins with the word "transmission."  The HTSUS does not define "transmission."  Therefore, the court turns to dictionary definitions to determine the proper meaning.  When interpreting a tariff term, the court may rely on its own understanding of the term and on secondary sources such as scientific authorities and dictionaries.  *North Am. Processing Co.*, 236 F.3d at 698 (citing *Carl Zeiss,* 195 F.3d at 1379).

Dictionaries on which both parties rely define the term "transmission" as follows: "1: the process of transferring a signal, message, picture, or other form of intelligence from one location to another location by means of wire lines, radio, light beams, infrared beams, or other communications systems", MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS (5th ed. 1994); "1: Conveyance or transfer from one person or place to another … 2: Conveyance or passage through a medium, as of light, heat, sound,

etc. Also *spec.,* the sending out of electronic signals or electromagnetic waves; the broadcasting of radio or television programs; . . .", SHORTER OXFORD ENGLISH DICTIONARY ON HISTORICAL PRINCIPLES (6th ed. 2007); "4. The sending of a signal, picture or other information from a transmitter," THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2011); "2. The passage of radio waves in the space between transmitting and receiving stations; *also*: the act or process of transmitting by radio or television." MERRIAM-WEBSTER ONLINE DICTIONARY.  Pl. Br. at 26; Def. Br. at 14-15.  In sum, dictionary definitions indicate that a transmission product sends a signal from one location to another location.

Similarly, the HTSUS does not define "apparatus"; however, the Court has construed that term on a number of occasions.  *See, e.g., Photonetics, Inc. v. United States*, 33 CIT 1549, 659 F. Supp. 2d 1317 (2009); *ITT Thompson Industries, Inc. v. United States*, 3 CIT 36, 537 F. Supp. 1272 (1982); *In re Alappat*, 33 F.3d 1526 (Fed. Cir. 1994).  In *ITT Thompson*, the court concluded that the term is "intended to encompass a group of devices or a collection or set of materials, instruments or appliances to be used for a particular purpose or a given end."  *ITT Thompson,* 537 F. Supp. at 1277.  Plaintiff does not offer any definitions of "apparatus," while defendant provides three dictionary definitions.  Those definitions are similar to the one used by the court in *ITT Thompson*.  *See* Def. Rep. Br. at 5-6.[3]  Therefore, the common meaning

---

[3] Defendant presents the following definitions:  "a set of materials or equipment designed for a particular use," MERRIAM-WEBSTER ONLINE DICTIONARY; "The technical equipment or machinery needed for a particular activity or purpose," LEXICO;  "a group or combination of instruments, machinery, tools, materials, etc., having a particular function or intended for a specific use," DICTIONARY.COM.  These definitions indicate that "apparatus" refers generally to a device designed for a particular use or purpose.

of the terms "transmission" and "apparatus" indicates devices designed for the purpose of sending signals from one location to another.

Plaintiff argues that "transmission apparatus" in Heading 8525 refers to equipment that sends signals out to a *final* reception device, which, for Heading 8525, would be either a radio or a television.  Pl. Br. at 15.  Plaintiff maintains that, in contrast, the meaning of the term "apparatus for the transmission" in Heading 8517 encompasses products that *support* transmission.  *See* Pl. Br. at 29-30.

This argument is not supported by the text of the HTSUS.  First, there is no indication in the text, Explanatory Notes or other interpretative materials that the use of the two nearly-identical terms — "transmission apparatus" in Heading 8525 and "apparatus for the transmission" in Heading 8517 — was intended to convey different meanings.  Second, the common meaning of the term "transmission apparatus" does not require, as plaintiff would have it, that the subsequent location be the *final* reception device.  *See* dictionary definitions discussed *supra* p. 18-19.  Similarly, there is no indication from the text that "transmission apparatus" reflects the narrow definition that plaintiff seeks to impose on it.[4]  In fact, the dictionary definitions cited above by both parties support a common meaning of "transmission" that "means to convey or transfer information, signals, or data from one location to another."  *See* Pl. Rep. Br. at 8, 25;

---

[4] Plaintiff cites Explanatory Note (A) to Heading 8525 as support for its narrow definition of "transmission apparatus" as "the apparatus that performs the act of sending a signal out."  Pl. Br. at 28.  Explanatory Note (A) provides a list of exemplars of merchandise that meet this definition, which "share the common purpose of performing the act of sending signals from one location to another."  Pl. Br. at 27.  Plaintiff then makes the logical leap that, "[i]n contrast, the Harmonic products do not send signals out to another location."  *Id.*

Def. Br. at 6.  Finally, the use of the more general term "transmission" also contrasts

with the word "transmitter", which is not used in Heading 8525 and connotes a narrower

meaning along the lines of that offered by plaintiff.  Def. Br. at 16.[5]

In addition to including the terms "transmission [] apparatus" and "apparatus for

the transmission," the plain language of Heading 8517 provides that, when television

signals are involved, Heading 8525 controls.  Heading 8517; *see also* Def. Br. at 17.

Based on this text, the drafters of the HTSUS apparently recognized that items may be

classifiable in both Headings 8517 and 8525, among others, regardless of the

construction of the words "transmission" and "apparatus."  Were it otherwise, the

drafters would not have expressly excluded television signals from Heading 8517.

Plaintiff maintains that Heading 8517 covers only items that support

transmission, while Heading 8525 encompasses only items that function as actual

transmitters.  Pl. Br. at 29.  This argument is incorrect.  Explanatory Note (G) to Heading

8517 names "transmitters" as an example of line equipment related to multiplexers.  EN

85.17(G)(7).  If Heading 8517 consisted only of items that *support* transmission, rather

than items that actually *transmit* signals, "transmitters" would not be listed in the

---

[5] Plaintiff also relies on an opinion of the World Customs Organization (WCO) that
classified digital encoders, multiplexers and remultiplexers in Heading 8517.  Pl. Br. at
21-22.  According to plaintiff, the WCO opinion determined that the items are classified
in Heading 8517 and not in Heading 8525 because they do not perform the function of
transmitting signals.  *Id*. at 21.  Plaintiff argues that the WCO opinion thus provides
guidance "that Heading 8525 'transmission apparatus' covers items that transmit a
signal and that Heading 8517's 'apparatus for the transmission' covers items that do not
transmit but that perform a function in support of transmission."  *Id*.  As noted above, the
language of the HTSUS does not support this conclusion.  *See* discussion *supra*
Section III.A.  Accordingly, the WCO opinion is entitled to "respectful consideration" by
the court; however, the court does not find the opinion persuasive.  *Cummins,* 454 F.3d
at 1366.

Explanatory Notes.  Heading 8517, therefore, describes both devices that actually

transmit and ones that support transmission.

Plaintiff next argues that Explanatory Note (A) makes clear that Heading 8525

applies only to actual transmitters, thereby excluding the subject Harmonic EMRs at

issue in this case.  The core premise of plaintiff's argument is that Explanatory Note (A)

to Heading 8525 should be interpreted based on the principle of *ejusdem generis* such

that it includes only devices that actually perform the act of sending signals from one

location to another.  Pl. Br. at 26-27.  Defendant argues that the principle of *ejusdem*

*generis* does not apply to the provision and that plaintiff's proffered interpretation would

improperly narrow the plain meaning of Heading 8525.

Explanatory Note (A) to Heading 8525 provides:

> "this group [of transmission apparatus for radio-broadcasting or television] *includes*:
> "(1) Transmitter for radio-broadcasting or television.
> (2) Relay apparatus used to pick up a broadcast for transmission and
> retransmit it to and so increase the range (including television relay apparatus
> for mounting in aircraft).
> (3) Relay television transmitters for transmission, by means of an aerial and
> parabolic reflector, from the studio or site of an outside broadcast to the main
> transmitter.
> (4) Television transmitters for industrial use (e.g., for reading instruments at a
> distance, or for observation in dangerous localities).  With this apparatus the
> transmission is often by line."

Explanatory Note (A) to Heading 8525 (emphasis supplied).

Generally*, ejusdem generis* analysis is a "canon of construction holding that

when a general word or phrase follows a list of specifics, the general word or phrase will

be interpreted to include only items of the same class as those listed."  BLACK'S LAW

DICTIONARY (11th ed. 2019).  *See also* MERRIAM-WEBSTER LAW DICTIONARY (defining

*ejusdem generis* as "a rule of construction: general words (as in a statute) that follow

specific words in a list must be construed as referring only to the types of things identified by the specific words."). Specifically, "In classification cases, *ejusdem generis* requires that, for any imported merchandise to fall within the scope of the general term or phrase, the merchandise must possess the same essential characteristics or purposes that unite the listed exemplars preceding the general term or phrase." *Avenues In Leather, Inc. v. United States*, 423 F.3d 1326, 1332 (Fed. Cir. 2005). These definitions, therefore, buttress the definition of "*ejusdem generis*" argued by defendant.

The list in question is not an exhaustive list with a catch-all term; rather, it is list of exemplars introduced by the word "including." The meaning of the word "including" varies with context. In a statute, it may serve to: (1) connote an illustrative application of the general description without limiting the general description, rather than to provide an all-embracing definition; (2) "add products to the heading that fall outside the general description"; (3) arrest any doubt as to whether the exemplars are included within the class; or, (4) "demarcate the boundary between what falls within the general class from that which falls without thereby limiting the scope of the general class." *Cummins Inc. v. United States,* 29 CIT 525, 533, 377 F. Supp. 2d 1365, 1372-73 (2005).

To decide which, if any, of these possibilities applies in the instant case, "the [c]ourt needs to read the 'including' language in light of the context and purpose of its use or as the legislative history may suggest." *Id*. (internal citations omitted). In this case, the most appropriate interpretation of the use of "including" for Explanatory Note (A) to Heading 8525 is the first interpretation. A structural analysis of Explanatory Note (A) to Heading 8525 suggests that the list in the Explanatory Note is illustrative. The Explanatory Note begins by describing the types of transmissions for which the

apparatus is used, that fall into the heading.  The Explanatory Note states that the "apparatus for radio-broadcasting falling in this group must be for the transmission of signals by means of electro-magnetic waves transmitted through the ether without any line connection.  On the other hand, television apparatus falls here whether the transmission is by electro-magnetic waves or by line."  HTSUS, EN 8525(A).  Explanatory Note (A) proceeds to list what "this group" includes.  *Id*.  Therefore, this structure indicates an intent to provide examples without limiting the general description.

Additionally, BLACK'S LAW DICTIONARY (9th ed. 2009) supports this interpretation by stating "[t]he participle including typically indicates a partial list."  This definition of "including" is accepted in many court decisions.  *E.g., Bloate v. United States,* 559 U.S. 196 (2010); *Amanda Foods (Vietnam) Ltd. v. United States*, 36 CIT 754, 647 F. Supp. 2d 1368 (2012).

This Court does not apply the principle of *ejusdem generis* to an illustrative list without a general "catch-all" term.  Indeed, all four cases cited by plaintiff in support of its argument apply *ejusdem generis* to lists that end with such a general term.  *See Otter Prod., LLC v. United States*, 834 F.3d 1369, 1376 (Fed. Cir. 2016) ("and similar containers"); *Victoria's Secret Direct, LLC v. United States*, 769 F.3d 1102, 1107 (Fed. Cir. 2014) ("and similar articles"); *Avenues in Leather, Inc. v. United States*, 178 F.3d 1241, 1244 (Fed. Cir. 1999) ("similar containers" and "similar articles"); *Sports Graphics, Inc. v. United States*, 24 F.3d 1390, 1392 (Fed. Cir. 1994) ("household articles not specifically provided for").  Therefore, none of the cases presented by plaintiff is apposite to the current case.

The court therefore determines based on the language of Explanatory Note (A) to Heading 8525 that the *ejusdem generis* principle does not apply.

Even, assuming *arguendo*, that *ejusdem generis* were to apply to the list in Explanatory Note (A), plaintiff's argument on this point would fail. That is because plaintiff here attempts to use an EN to Heading 8525 to define "transmission apparatus" more narrowly than the plain meaning of the words in the heading. This Court and the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") have rejected similar attempts to use ENs to interpret a heading as narrower than its plain meaning interpretation. *See Rubie's Costume Co. v. United States* 337 F.3d 1350, 1359 (Fed. Cir. 2003); *Apple Inc. v. United States*, 43 CIT __, 375 F. Supp. 3d 1288 (2019), *aff'd*, 964 F.3d 1087 (Fed. Cir. 2020). For example, in *Rubie's Costume*, the Federal Circuit rejected such an interpretation, stating that "[a]lthough the examples in the ENs are probative and sometimes illuminating, we shall not employ their limiting characteristics, to the extent there are any, to narrow the language of the classification heading itself." 337 F.3d at 1359. Accordingly, the court rejects plaintiff's two-part argument concerning the application of Explanatory Note (A) to Heading 8525.

### b.    Television

The court turns next to the meaning of the term "television" in Heading 8525. The HTSUS does not define the term "television" in Heading 8525. The Court has defined television as "vision at a distance; hence, the transmission and reproduction of a view or scene, esp. [sic] a view of persons or objects in motion, by any device which converts light rays into electrical waves and reconverts these into visible light rays." *Sears Roebuck & Co. v. United States*, 16 CIT 305, 307, 790 F. Supp. 299, 301 (1992)

(citing WEBSTER'S NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE (2d ed. 1961)).

     To determine the correct meaning of television, the court consults the same dictionaries that the court used to clarify the definition of "transmission". These dictionaries define "television" as follows: "A system for converting a succession of visual images into corresponding electric signals and transmitting these signals by radio or over wires to instant receivers at which the signals can be used to reproduce the original images." MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS 5th ed. 1994). Similarly, the SHORTER OXFORD ENGLISH DICTIONARY ON HISTORICAL PRINCIPLES (6th ed. 2007) defines television as a: "1: A system for reproducing on a screen visual images transmitted (usu. with sound) by radio signals; … 2: The medium, art form, or occupation of broadcasting on television; (with specifying word) a particular television service or company.  Now also, televised entertainment, the content of television programmes . . . 3: A device with a screen for receiving television signals."[6]

     Heading 8525 provides "transmission apparatus for television or radio-broadcasting, whether or not incorporating reception apparatus or sound reproducing

---

[6] *See also*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE: "1.a. An electronic broadcast system in which special providers transmit a continuous program of video content to the public or subscribers by way of antenna, cable, or satellite dish, often on multiple channels: . . . b. Video content, especially short programs, created for or distributed through such a system: . . . c. An electronic device for viewing television programs and movies, consisting of a display screen and speakers: . . . 2. The industry of producing and broadcasting television programs: . . ."; and, MERRIAM-WEBSTER ONLINE DICTIONARY: "1: an electronic system of transmitting transient images of fixed or moving objects together with sound over a wire or through space by apparatus that converts light and sound into electrical waves and reconverts them into visible light rays and audible sound; 2: a television receiving set; 3a: the television broadcasting industry; b: television as a medium of communication; c: programming distributed over the Internet that is designed to be viewed in the same format as broadcast television."

apparatus." The qualifier in Heading 8525 describes items in Heading 8517 and Note 2(b) of Section XVI of the HTSUS states that a product that is *equally* classifiable in both Heading 8525 and Heading 8517 should be classified in Heading 8517. Therefore, classification under Heading 8525 is proper only for instances in which a product is *primarily* classifiable in Heading 8525 by way of its principal use in television or radio-broadcasting.

### 2.    Principal Use Analysis

The court considers next whether a principal use analysis is appropriate in the instant case. Heading 8529 is a use provision, as it includes parts that are "suitable for *use solely or principally* with the apparatus of headings 8525 to 8528." (Emphasis supplied). *See Samsung Int'l, Inc. v. United States*, 36 CIT 1531, 1556, 887 F. Supp. 2d 1330, 1350 (2012), *aff'd*, 546 F. App'x 961 (Fed. Cir. 2013) (confirming Heading 8529 is a use provision). Relevant in the present case, Heading 8529 covers, among other things, parts of "transmission apparatus for radio-broadcasting or television" under Heading 8525.

Because Heading 8529 is a use provision, whether the subject PCBAs and chassis are correctly classified under this heading depends on whether the Harmonic EMRs with which they are used are correctly classified under Heading 8525 or Heading 8517. Accordingly, the court must determine if the subject merchandise is principally used as a constituent part of merchandise that are "transmission apparatus for radio-broadcasting or television" under Heading 8525, or instead "other apparatus for the transmission or reception of voice, images or other data, including apparatus for communication in a wired or wireless network" under Heading 8517. Therefore, the

ways in which Harmonic customers use Harmonic EMRs are relevant to classifying the subject PCBAs and chassis.

Defendant asserts that the most frequent purchasers of the subject Harmonic EMRs from 2010 to 2012 were television content providers that used them for the transmission of data signals for television content.  Def. Stmt. Facts ¶ 20 (citing Def. Ex. 3 (Armstrong Dep.) at 18).  Plaintiff does not address directly the question of the most frequent purchasers.  Harmonic testified that its customers buy their EMRs because Harmonic offers digital cable and delivers more channels over the same bandwidth previously used to transmit analogue channels.  Def. Ex. 3 (Armstrong Dep.) at 19.

However, having conceded that the Harmonic EMRs perform these functions, plaintiff argues that Heading 8525 does not describe these products because they have "capability that is *greater than* just supporting TV and radio programming."  Tr. Oral Arg. at 39 (emphasis supplied).  Further, plaintiff contends that "the wide range of audio/video content that is compressed by Harmonic EMRs is not described by the language 'for radio broadcasting or TV.'"  *Id*.  Plaintiff cites GRI 1 as supporting the interpretation that "a device that has a use *and capability*" different than that described by Heading 8525 should not be classified in Heading 8525.  *Id*. (emphasis supplied).

The record demonstrates a growing trend in the transmission of compressed data to devices other than televisions.  Pl. Ex. F (Written Report by Expert Dan Schonfeld) ("Schonfeld Expert Report") at 4-5.  This report explains the digitalization of communication systems, including telephone and television networks, into multimedia communication networks offering telephone, television and Internet services.  *Id*. at 5. Similarly, the report describes the rise of computers as multimedia platforms.  *Id*.

Harmonic EMRs have the capability to be used in these multimedia communication systems.

Further, it is correct that Harmonic encoders are suited for compressing any image (in addition to sound).  *See* Pl. Ex. A (Joint Stmt. of Facts Not in Dispute) at ¶ 10 ("The Harmonic encoders compress audio and video digital data representing images and sounds including voice"); *see also* Pl. Ex. E (Declaration of Eric Armstrong) at ¶ 5 ("Harmonic encoders are designed and used solely for the compression of digital data and representing sounds and images.").  The multiplexers and remultiplexers further compress these data outputs of images and sound.  *Id*. at ¶¶ 14-15.

The "[s]usceptibility, capability, adequacy, or adaptability of the import to the common use of the class is not controlling."  *USR Optonix, Inc. v. United States*, 29 CIT 229, 247, 362 F. Supp. 2d 1365, 1381 (2005) (citing *U.S. v. the Carborundum Co*., 63 CCPA 98, 102, 536 F.2d 373, 377 (1976).[7]  The Court in *Optonix* also applied Additional U.S. Rule of Interpretation 1(a), which "provides that '[i]n the absence of special language or context which otherwise requires — a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United

---

[7]  When making a principal use determination, the court makes "a determination as to the group of goods that are commercially fungible with the imported goods."  *BenQ Am. Corp. v. United States*, 646 F.3d at 1380 (internal quotation marks and citation omitted).  In doing so, the court may examine the *Carborundum* factors, which include: "(1) the general physical characteristics of the merchandise; (2) the expectation of the ultimate purchasers; (3) the channels of trade in which the merchandise moves; (4) the environment of the sale (*e.g.,* the manner in which the merchandise is advertised and displayed or the accompanying accessories); (5) the usage of the subject merchandise and whether that use corresponds to the use of class-defining merchandise; (6) the economic practicality of using the import in that manner; and (7) the recognition in the trade of this use."  *Optonix*, 362 F.Supp.2d at 1381 (citing *Carborundum*, 536 F.2d at 377).

States at, or immediately prior to, the date of importation."  *Optonix*, 29 CIT at 247; *see also* Additional U.S. Rule of Interpretation 1(a), HTSUS.  The Rule further clarifies that "the controlling use is the principal use."  *Id*.[8]  Principal use analysis "considers a variety of factors, including actual use, 'to classify particular merchandise according to the ordinary use of such merchandise, even though particular imported goods may be put to some atypical use.'"  *Apple Inc. v. United States*, 964 F.3d 1087, 1094-95 (Fed. Cir. 2020) (citing *Aromont USA, Inc. v. United States*, 671 F.3d 1310, 1313-14 (Fed. Cir. 2012) (internal quotation marks and citation omitted)).

In this case, there is a genuine factual dispute between the parties as to the principal use of the subject Harmonic EMRs from 2010 to 2012.  Defendant asserts that the principal users of the subject merchandise were television content providers that used Harmonic EMRs to transmit data signals for television content.  Def. Stmt. Facts ¶ 20 (citing Def. Ex. 3 (Armstrong Dep.) at 18).  By contrast, plaintiff centers its arguments on the *suitability* and increasing use of the Harmonic EMRs for non-television-related uses.  Pl. Br. at 30-31; Tr. Oral Arg. at 25-27.  *See also* Pl. Resp. Def. Stmt. Facts ¶ 20. Accordingly, genuine issues of material fact remain as to whether the PCBAs and chassis at issue here are constituent parts of merchandise principally used "for radio-broadcasting or television" or for the "reception of voice, images, or other data . . . in a wired or wireless network."  *See Roche Vitamins*, 750 F.Supp.2d at 1377-78.

---

[8] The full text of Additional U.S. Rule of Interpretation 1(a) reads: "1. In the absence of special language or context which otherwise requires — (a) a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of goods of that class or kind to which the imported goods belong, and the controlling use is the principal use. . . ."

### 3. The Relevance of Explanatory Note (G) to Heading 8517

Plaintiff also asks the court to consider Explanatory Note (G) to Heading 8517 as persuasive authority for the proposition that the subject merchandise should be classified in that heading. For the reasons elaborated below, the court concludes that the persuasive authority of Explanatory Note (G) is limited.

Explanatory Note (G) states that equipment of Heading 8517 includes apparatus for the transmission of "speech or other sounds, images or other data" within "communication networks . . . that may be configured as public switched telephone networks, Local Area Networks (LANs), Metropolitan Area Networks (MANs) and Wide Area Networks (WANs)." Explanatory Note (G) then provides a list of what this group may include. Explanatory Note (G)(4) specifically lists multiplexers, one of the three products that comprise the Harmonic EMRs at issue. Explanatory Note (G)(5) also lists "codecs" and describes codecs as "data compressors/decompressors". The encoders of the Harmonic equipment compress data, so Explanatory Note (G)(5) describes their function.

Defendant responds to this argument in three ways. Defendant argues that rather than demonstrating that the subject merchandise provides "for the connection to a wired or wireless communication network or reception of speech or other sounds, images, or other data within such a network," as required by Explanatory Note (G), the subject merchandise is "primarily used" by TV providers to compress data to relay to consumer televisions. Def. Br. at 19; *see also* Def. Rep. Br. at 3, 12-13. Defendant also argues that plaintiff's reliance on the ENs is "misplaced" because (1) they are not

legally binding, and (2) plaintiff is using *ejusdem generis* to limit impermissibly the meaning of the heading based on a non-exhaustive list.  Def. Rep. Br. at 11-12.  Finally, defendant notes that Congress specifically excluded "transmission apparatus" that fall under Heading 8525 from Heading 8517.  In sum, defendant argues that the multiplexers and codecs listed in Explanatory Note (G) might be properly classified at Heading 8517, but that these products could also fall under Heading 8525 (as the subject merchandise specifically warrants).  Def. Rep. Br. at 12.

When the ENs "specifically include or exclude an item from a tariff heading," they serve as persuasive authority for the court.  *H.I.M./Fathom, Inc. v. United States*, 981 F. Supp. at 613 (1997).  However, notably, the ENs to Heading 8517 do not specifically name either encoders or remultiplexers.  Further, Explanatory Note (G)(5) lists "codecs . . . which have the capability of transmission and reception of digital information."  At oral argument, plaintiff conceded that Explanatory Note (G)(5) does not reflect fully the subject Harmonic encoders because, according to plaintiff, the encoders included in the subject merchandise "do not transmit."  Tr. Oral Arg. at 8.  Therefore, the persuasive authority of Explanatory Note (G) is limited.

### 4.    Meaning of the 2007 Amendments

Plaintiff also argues that the 2007 amendments to Heading 8517 support plaintiff's interpretative positions.

In 2007, Heading 8517 was amended in two significant respects.[9]  First, Congress amended Heading 8517 to include the language "apparatus for the

---

[9] The 2007 amendments to HTSUS 8517 at issue here were made pursuant to Proclamation No. 8097, 72 Fed. Reg. 453 (Jan. 4, 2007).  The superseding language to 8517 is listed in Modifications to the Harmonized Tariff Schedule of the United States

transmission." Second, Congress added exclusionary language clarifying that any apparatus for transmission or reception that is properly classified under Heading 8525 is excluded from Heading 8517.

Plaintiff argues that the first amendment demonstrates an intention "to cover equipment such as the Harmonic encoders, multiplexers and remultiplexers that did not exist in 1970." Pl. Rep. Br. at 15. Defendant's position is that this interpretation would have the effect of incorporating into Heading 8517 items described in other headings, including Heading 8525. Tr. Oral Arg. at 74. Defendant adds that the excluding language in Heading 8517 is meant to address this potential conflict. *Id.*

The pre-amendment text of Heading 8517 was: "Electrical apparatus for line telephony or line telegraphy, including line telephone sets with cordless handsets and telecommunication apparatus for carrier-current line systems or for digital line systems; videophones; parts thereof." Post amendment, the text of Heading 8517 still begins with a focus on telephones, providing: "Telephone sets, including telephones for cellular networks or for other wireless networks; other *apparatus for the transmission* or reception of voice, images or other data, including apparatus for communication in a wired or wireless network (such as a local or wide area network), *other than* transmission or reception apparatus of heading 8443, 8525, 8527 or 8528; parts thereof." Heading 8517 (emphasis supplied). In addition, Congress added new subheading language at 8517.61-69 for "other apparatus for transmission or reception

---

Under Section 1206 of the Omnibus Trade and Competitiveness Act of 1998, USITC Pub. 3898 (Dec. 2006).

of voice, images or other data" and "machines for the reception, conversion and transmission or regeneration of voice, images or other data."

Interestingly, neither party addresses expressly the addition of exclusionary language in the 2007 amendments; however, both parties address the exclusion in more general terms.  Defendant mentions that "the 2007 language did not do anything" to remove the exclusion "so the exclusion still stands."  Tr. Oral Arg. at 74.  However, an examination of the archived pre-2007 amendments text of Heading 8517 makes clear that this exclusion was *added* in 2007; it did not simply go unchanged.[10]

Defendant argues that, but for the exclusionary clause, "transmission apparatus for television" could potentially be considered an "apparatus for the transmission of voice, images or other data" under Heading 8517.  Thus, defendant argues that "the plain language of heading [sic] 8517 establishes that, when television signal [sic] are involved, heading [sic] 8525 controls."  Def. Br. at 17.

Plaintiff seeks to buttress its argument with respect to the impact of the 2007 amendments on the language of Heading 8517 by noting that new subheading language was also inserted at subheading 8517.61-69 for "other apparatus for transmission or reception of voice, images or other data" and "machines for the reception, conversion and transmission or regeneration of voice, images or other data." Pl. Br. at 19-20.

---

[10] The language prior to the 2007 amendments, which did not contain the exclusionary language, is included in the preliminary version of the 2007 HTSUS.  *See* HTSUS 8517 (Prelim. 2007).  The exclusionary clause first appeared after the 2007 amendments in the basic edition.  *See* HTSUS 8517 (2007).  This suggests that the exclusionary language was added between the publication of the Preliminary and Basic editions of the 2007 HTSUS.

Pursuant to GRI 1, when making classification decisions, the court takes a top-down approach, beginning "as it must, with the language of the headings" and ending with the language of the subheadings.  *Orlando Food Corp.*, 140 F.3d at 1440.  As the Federal Circuit stated in that case: "[W]hen determining which heading is the more specific, and hence the more appropriate for classification, a court should compare only the language of the headings and not the language of the subheadings . . . .  Only after determining that a product is classifiable under the heading should the court look to the subheadings to find the correct classification for the merchandise."  *See also Gerson Co. v. United States*, 41 CIT __, __, 254 F. Supp. 3d 1271, 1273 (2017), *aff'd*, 898 F.3d 1232 (Fed. Cir. 2018 (citing *Orlando Food Corp.*, 140 F.3d at 1440).

In this regard, plaintiff's proffered interpretation of the 2007 amendments to Heading 8517 is inconsistent with both the exclusionary clause added by those amendments and principles of statutory interpretation.  Under the pre-2007 amendment text of Heading 8517, the court clarified that "Heading 8517 covers telegraphic functions."  *David W. Shenk & Co. v. United States*, 21 CIT 284, 288, 960 F. Supp. 363, 367 (1997).  Given this history, the preservation of a focus on telephones in the post-2007 amendment text, and the addition of language that expressly excludes merchandise classifiable under Heading 8525, plaintiff's interpretation is not apt.

### 5.    Customs' Transmission Path Theory and Deference to Prior Ruling Letters

Plaintiff next argues that Customs' HQ H193879 (Def. Ex. 1), which concerned the classification of the subject merchandise, is unpersuasive and, therefore, should not

be given deference by this court.  *See* Pl. Br. at 16.[11]  In particular, plaintiff challenges

the use by Customs in HQ H193879 of a classification approach that Customs has

labeled the "transmission path theory", as unfounded and inconsistently applied.  *Id*. at

16-18.

The court determines that the "transmission path theory" used by Customs in its

HQ H193879 letter (Def. Ex. 1) is persuasive and deserving of deference in relation to

the context of the instant case.  However, the court reserves judgment as to the

applicability of these ruling letters to the present case pending the resolution of the

issue of principal use.

As noted, the court reviews classification cases *de novo*.  *See* 28 U.S.C. §

2640(a)(1).  Customs' ruling letters, as explanations of classification decisions, are

entitled to a level of "respect proportional to their power to persuade."  *United States v.*

*Mead Corp.*, 533 U.S. 218, 235 (2001) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134,

140 (1944)).  Factors that influence the persuasive power of a ruling letter include the

agency's thoroughness, logic and expertness, and consistency with prior interpretations.

*Mead Corp.,* 533 U.S. at 235.  Consistency, in particular, in Customs' interpretation of a

provision "enhances the persuasive power of that interpretation."  *Dell Prods. LP v.*

*United States*, 642 F.3d 1055, 1060 (Fed. Cir. 2011).  The reverse also applies.  A lack

of consistency in the use of an approach "indicates that Customs has not thoroughly

---

[11] Defendant does not seek deference for Customs' Ruling Letter HQ H193879.  Pl Rep.
Br. at 6; *see also* Def. Rep. Br. at 4 ("Plexus appears to suggest that some meaning
should be ascribed to our decision not to seek deference for Customs' Ruling Letter HQ
H193879.  No such meaning exists.  As we demonstrated in our briefing, Customs'
classification of the imported merchandise is the correct one . . . the dispute remaining,
here, is the correct statutory meaning of 'transmission apparatus for . . . television' in
Heading 8525, which is subject to this Court's *de novo* review.").

considered a particular classification and undermines the persuasive power of its conclusions." *Sony Elecs., Inc. v. United States*, 37 CIT 1748, 1755 (2013).

Customs' transmission path theory, in brief, suggests that products related to television transmission systems "which lie in the transmission path . . . are classified in heading 8525, HTSUS, as transmission apparatus [for radio-broadcasting or television]." Pl. Br. at 17 n.26. Plaintiff implies that in the past, Customs considered the classification of products that were arguably "in the transmission path" and thus should have been classified in Heading 8525; instead, plaintiff argues, Customs classified those products in other headings such as Heading 8517, as "apparatus for the transmission or reception of voice, images, or other data." *See id.* at 18.

For example, plaintiff discusses previous Customs' ruling letters, HQ 967631 (Dec. 14, 2005) and New York Ruling Letter ("NY") N179936 (Aug. 25, 2011), which classified Cisco switches under Heading 8517. *Id.* at 18 n.27. In these letters, Customs did not state that the Cisco switches lie "in the transmission path," even though the Cisco switches were placed between Harmonic's encoders and multiplexers. *Id.* at 18; *see also* Pl. Ex. B (Harmonic Graphic). Plaintiff contends that Customs should have found the Cisco switches also to have been "in the transmission path," and that Customs' failure to do so is an example of inconsistent application of the transmission path theory. Pl. Br. at 18.

Similarly, plaintiff points to Customs' failure to use its transmission path theory to classify products in Heading 8525 in the following seven ruling letters as further evidence of the lack of consistency in the application of the transmission path theory: (1) HQ 084703 (Sept. 13, 1989); (2) NY M87074 (Oct. 13, 2006); (3) HQ H118695 (Sept. 2,

2010); (4) NY N285326 (May 3, 2017); (5) HQ H097678 (June 3, 2010); (6) NY

N301903 (Dec. 12, 2018); and, (7) NY R02506 (Sept. 8, 2005). *Id*. at 18–19 n.28.

Customs responds that "Plexus' claims of inconsistent application are

unfounded." Def. Br. at 17. Customs first quotes from HQ H193879 (Def. Ex. 1), in

which Customs made the following statement:

> CBP has a longstanding line of decisions which have [sic] determined that
> components of television transmission systems which lie in the transmission
> path, receive a signal and the output of which is relayed or fed further in the
> transmission system for eventual final reception and display, are classified
> in heading [sic] 8525, HTSUS, as transmission apparatus.

The ruling letters on which Customs relied for support in the instant case are: (1) HQ

955309 (Dec. 21, 1993); (2) HQ 958422 (Feb. 1, 1996); (3) HQ 962919 (Apr. 10, 2000);

(4) HQ H005123 (Dec. 29, 2008); and, (5) HQ H068675 (Oct. 16, 2009). *See* Def. Ex.

1.

To determine the extent to which Customs' transmission path theory is well-

founded and consistently applied, and, therefore, the extent to which the court considers

the prior practice to be persuasive in this case, the court first examines the ruling letters

cited by plaintiff. In regard to HQ 967631 and NY N179936 concerning the Cisco

switches, plaintiff's argument is flawed because the Cisco switches included in

Harmonic EMRs differ from the ones that Customs considered in those decisions. For

plaintiff's argument to be correct, the Cisco switches to which plaintiff refers that are

used in Harmonic EMRs and the Cisco switches at issue in HQ 967631 and NY

N179936 would need to be the same, or at least relatively similar. However, they are

neither. In particular, the Cisco switches in Harmonic EMRs appear to be from the 3850

Series and 2960 Series, whereas the ones considered in HQ 967631 and NY N179936

were the Cisco Catalyst 4000 Series Switches for Internet Protocol (IP) telephony.  *See*

Pl. Ex. B; HQ 967631 at 2, 4; NY N179936.  Moreover, unlike the Cisco switches used

in Harmonic EMRs, the switches at issue in HQ 967631 and NY N179936 operated in

products that did not serve the function of television signal transmission and, therefore,

do not provide an appropriate comparison.  *Id.*

Specifically, in HQ 967631, the issue was whether a line card (printed circuit

assembly) used exclusively in Cisco Catalyst 4000 Series Switches for Internet Protocol

(IP) telephony was properly classified under Heading 8517 as an electrical apparatus

for line telephony and line telegraphy.  *See* HQ 967631 at 2, 4.  In that case, Customs

classified the product in Heading 8517, because the product's sole use was in switches

for IP telephony, and the line card was specifically provided for in subheading

8517.90.4400, HTSUS.  *Id.* at 5.  Similarly, in NY N179936, Customs determined that

Cisco Catalyst 3750 Series Switches described as "computer network hosting

equipment" were provided for in subheading 8517.62.0050, HTSUS.  *See* NY N179936.

In sum, in both HQ 967631 and NY N179936, the products at issue were specifically

identified in Heading 8517.  Accordingly, in both cases, Customs' transmission path

theory, which is used to classify products related to television transmission systems in

Heading 8525, was not relevant.

As to the remaining seven ruling letters cited by plaintiff, none of the letters

indicates that Customs has applied its transmission path theory in an inconsistent

manner.  In HQ 084703, which concerned video editing equipment, plaintiff is correct in

noting that Customs did not mention the transmission path theory.  As Customs

explained in a more recent decision, HQ H118695, which concerned a 3D image

processor, the video editing process occurs outside of the television transmission path and thus does not fall under Heading 8525. *See* HQ H118695 at 4.

Similarly, NY M87074 does not support plaintiff's inconsistent usage argument because in that case the product at issue was a mobile collaboration device that did not broadcast to a large enough population to be considered a television device. *See* NY M87074 at 1. In other words, Customs did not need to apply its transmission path theory because Customs had already determined that the nature of the product precluded classification under Heading 8525. *Id.*

Additionally, NY N285326 does not provide guidance in the present case because that ruling relied on application of a different statutory instruction, GRI 3(c). In that letter, Customs determined that audio/video production units were not *prima facie* classifiable under Heading 8525 as the heading does not cover the editing function of the production units. *See* NY N28526 at 3. Customs ultimately classified the products using GRI 3(c). *Id.* Under GRI 3(c), the question is not whether the product is *prima facie* classifiable under the language of a particular heading as in GRI 1, but rather which of two or more possible headings occurs last in numerical order. Therefore, NY N285326 is inapposite because it concerned the application of a different GRI in a different context.

Further, the remaining three letters also do not provide guidance in this case with respect to Customs' use of the transmission path theory. In HQ H097678, which involved coaxial cables, Customs did not need to apply its transmission path theory to classify the product in Heading 8525 because Heading 8544 specifically provides for coaxial cables. *See* HQ H097678 at 4. Similarly, in NY N301903, Customs did not

need to apply its transmission path theory because the product at issue, a video

conferencing system, was prima facie classifiable under Heading 8517.  *See* NY

N301903 at 1.  Likewise, NY R02506 can be distinguished because the product at issue

was principally used for voice and data transmission, and thus fell under Heading 8517.

*See* HQ H005123 at 6 (distinguishing the merchandise in NY R02506 from Plexus

encoders because the former was capable of transmitting telephonic data signals).

In sum, plaintiff has failed to establish that Customs' transmission path theory is

either unfounded or inconsistently applied.  The court next considers the five ruling

letters cited by Customs in its foundational ruling letter on the transmission path theory.

*See* HQ H193879 (Def. Ex. 1).

The ruling letters cited by Customs provide strong support for Customs'

transmission path theory.  In HQ 955309, for example, Customs determined that a

component of a digital satellite system that is used for television is properly classified in

Heading 8525, noting that the product is "in the transmission path, but it is not at the

end of the transmission path where final reception and viewing takes [sic] place."  HQ

955309 at 2 (quoting HQ 088255 at 4 (Dec. 17, 1990)).  Similarly, in HQ 958422,

Customs determined that a component of a television satellite dish should be classified

in Heading 8525 because, as in the case of the digital satellite system considered in HQ

955309, it "lies in the transmission path" and receives signals and relays them for final

reception and display.  HQ 958422 at 4-5.

In HQ 962919, Customs considered the classification of encoders that are used

to compress signals for eventual television transmission — much like the Harmonic

EMRs at issue in the present case — and determined that they are covered under

Heading 8525.  There, Customs cited another ruling letter, HQ 088746 (May 13, 1991),

in support of its conclusion.  *See* HQ 962919 at 3.  In HQ 088746, Customs classified a

type of signal processor under Heading 8525 while noting that the product is "in the

transmission path, but it is not at the end of the transmission path where final reception

and viewing takes place."  HQ 088746 at 4.

Further, in HQ H005123, a previous Plexus ruling, Customs found that the

encoders at issue were apparatus for television transmission in Heading 8525.  *See* HQ

H005123 at 6-7.  There, the key inquiry involved the type of signal being transmitted.

*Id.* at 6.  Customs found that the encoders did not transmit telephonic data signals and

therefore did not fit under Heading 8517.  *Id.*

Finally, in HQ H068675, Customs observed that filters that alter cable television

transmission "lie in the transmission path, receive a signal, and relay . . . signals further

in the transmission system for eventual final reception and . . . display."  HQ H068675 at

4.

Taken as a whole, these ruling letters cited by Customs indicate that Customs

has consistently applied its transmission path theory to classify television transmission

equipment that lies in the transmission path, receives a signal, and relays an output

further down the transmission system, and, for those reasons, is properly classified in

Heading 8525.  Contrary to plaintiff's assertions, Customs has shown consistency in its

application of the "transmission path theory" to classify components of television

transmission systems under Heading 8525.   The court reserves judgment as to the

applicability of these ruling letters to the present case pending the resolution of the

issue of principal use.  However, the court determines that the "transmission path

theory" used by Customs in its HQ H193879 letter (Def. Ex. 1) is persuasive and deserving of deference in relation to the context of the instant case.

### 6.      Relevance of the CCPA *Ampex* Decision

Finally, defendant urges the court to look to a decision of the U.S. Court of Customs and Patent Appeals ("CCPA") that interpreted apparatus of television transmission to "perform any of a wide variety of functions in connection with television transmission and reception" in the classification of television camera cables. *United States v. Ampex Corp.*, 59 CCPA 134, 138, 460 F.2d 1086, 1088 (1972). As discussed below, the court considers the CCPA's characterization in *Ampex* of "television transmission apparatus" instructive, albeit not persuasive.

Plaintiff argues that *Ampex* should not apply to the present case for three reasons. First, because the appeals court analyzed *Ampex* under the Tariff Schedule of the United States ("TSUS") rather than the HTSUS, its analysis does not provide guidance. Pl. Rep. Br. at 14. Second, because the CCPA applied the rule of "relative specificity," which has since been codified in HTSUS at GRI 3, the *Ampex* court's analysis is inapplicable to the present action because it involves classification pursuant to GRI 1. *Id*. Third, because the *Ampex* court derived its meaning of "transmission apparatus" from a single lexicographic source from 50 years ago, its interpretation is inapplicable. *Id*.

The Federal Circuit has held that the CCPA's prior determination of a common meaning of a term, based on an interpretation of a tariff provision under the TSUS, is not controlling as to a determination under the HTSUS. Where the language of the provisions of the TSUS and the HTSUS is identical, decisions interpreting the TSUS

may be instructive, but they are not dispositive.  *JVC Co. of Am. v. United States*, 234 F.3d 1348, 1354-55 (Fed. Cir. 2000).

The relevant portion of Heading 685.20, TSUS, refers to "radio-broadcasting and television transmission and reception apparatus."  The relevant portion of Heading 8525, HTSUS, states "transmission apparatus for radio-broadcasting and television."  Although the two provisions are not identical, their difference as pertaining to the issues in this case is only in the order of the terms.

The court finds plaintiff's second reason unconvincing.  The CCPA's interpretation of "transmission apparatus" comes before and is separate entirely from the CCPA's application of "relative specificity."  Here, the court is concerned only with the CCPA's interpretation of a tariff term.  Defendant's reliance on *Ampex* is more limited than plaintiff ascribes.  Defendant relies on *Ampex* only as persuasive authority to support a broad interpretation of "transmission apparatus for radio-broadcasting or television."  Def. Rep. Br. at 8.  Defendant does not rely on arguments relating to CCPA's discussion of "relative specificity."  As a consequence, plaintiff's arguments are unsuccessful in undermining defendant's citation of *Ampex*.

The court also considers plaintiff's third reason unconvincing.  In *Ampex*, the appeals court recalls a chapter on Television Systems Fundamentals in a book entitled *Television Broadcasting* in arriving at the court's definition of "television transmission."  *Ampex*, 460 F.2d at 1088.  There is no indication that the understanding of the terms "transmission" or "television" have changed significantly since the CCPA published this opinion.  Therefore, to deny the characterization of "transmission

apparatus" provided by an industry-specific source on which the court relied would be arbitrary.

In sum, the court considers the CCPA's characterization in *Ampex* of "television transmission apparatus" instructive, albeit not persuasive. The interpretation by the appeals court of the terms as to "perform any of a wide variety of functions in connection with television transmission and reception" supports the interpretation of "transmission apparatus for television," discussed *supra* section III.A, as devices designed for the purpose of sending signals from one location to another for the eventual transmission of viewing television content. The *Ampex* court's interpretation is consistent also with the description of "transmission path" as stated in and applied by previous Customs ruling letters to be components of television transmission systems that lie in the transmission path and receive a signal, the output of which is relayed to or fed further into the transmission system for eventual final reception and display.

Heading 8525 covers apparatus whose principal function is to send signals from one location to another within the transmission path ultimately for television viewing or radio-broadcasting. Further, the plain language of the heading indicates that it does not limit classification to items that directly transmit radio and television data to the receiving device.

### B.    Application of Headings 8517 and 8525 to the Subject Merchandise

Heading 8517 expressly excludes products classified in Heading 8525. Accordingly, the court's inquiry begins with whether the subject merchandise is properly classified in Heading 8525. *Faus Group, Inc. v. United States*, 581 F.3d 1369, 1371-72 (Fed. Cir. 2009). As noted above and as elaborated below, the court determines that factual issues regarding the principal use of the subject merchandise remain

unresolved. Consequently, the court does not reach a conclusion as to whether the proper classification of the subject merchandise is Heading 8529, which is comprised of parts suitable for use solely or principally with the apparatus of Heading 8525, or Heading 8517.

### 1.  Heading 8525

The relevant language in Heading 8525 describes properly classified products as "transmission apparatus for . . . television." Whether Heading 8525 covers the Harmonic EMRs that are the subject of this case depends specifically on whether the equipment sends data that will be used principally for viewing television content as opposed to videoconferencing or other content.

Plaintiff relies on the Schonfeld Expert Report to support the argument that "[t]he data that is [sic] compressed and multiplexed by the Harmonic encoders, multiplexers and remultiplexers ultimately can be listened to and watched on smart phones, personal computers and other devices not limited to televisions or radios, and can consist of video conferencing and other audio video content that is not television or radio programming." Pl. Stmt. Facts ¶ 21 (citing Pl. Ex. F (Schonfeld Expert Report) at 18, 39; Pl. Ex. I (Deposition of Dan Schonfeld) ("Schonfeld Dep.") at 48, 133).

The Schonfeld Expert Report and deposition do not support plaintiff's conclusion. Schonfeld in his testimony described how encoders, multiplexers and remultiplexers are *generally* used, and how the Harmonic EMRs *can* be used. However, Schonfeld made clear that he was not familiar with Harmonic's business or the customers for the subject merchandise. Pl. Ex. I (Schonfeld Dep.) at 128. For example, when asked if he knew whether the Harmonic EMRs "are used over the Internet, whether they're used with a cable system or used some other way," Schonfeld responded: "I do not know." *Id*.

When asked if there is "a way to tell by looking at kind of [sic] the description of the specifications to see if that would tell us how a particular device is being used," he responded that there is "no way to tell exactly how it's being used."  *Id*.  Later, when asked if he did not "know with specificity how Harmonic is using their particular finished products," Schonfeld responded: "That's right.  I do not know."  *Id*. at 158.

Expert witness Eric Armstrong is Harmonic's Vice President of SaaS Solutions. Unlike Schonfeld, Armstrong was familiar with the ways in which Harmonic's customers used the EMRs.  Def. Ex. 3 (Armstrong Dep.) at 10.  After being asked to describe the nine products that comprise the subject merchandise, Armstrong described them as being "used in [Harmonic's] customers' infrastructure.  Their *primary purpose* is video and audio compression and multiplexing," *Id.* at 18 (emphasis supplied), with the term compression being "[p]rimarily about reducing the bandwidth of video, the amount of space it would occupy on a storage device or the amount of bandwidth it would occupy as the video is transmitted *for a T.V. service*."  *Id*. (emphasis supplied).

Armstrong expressed the view that Harmonic's *customers* are primarily television service providers.  *Id*. at 27-29, 31-33, 46-47, and 87; *see also* Def. Br. at 12.  Similarly, Harmonic's Director of Product Line Management for Compression and Stream Processing, Neil Brydon, also declared that "Harmonic's encoders, multiplexers and remultiplexers are optimized for use in cable, satellite, IPTV and terrestrial applications." Pl. Ex. D (Declaration of Neil Brydon) ("Brydon Declaration") at ¶ 4.  Finally, at oral argument, defendant declared that Verizon uses the subject merchandise to provide television content and not telephony, which is covered by Heading 8517.  Tr. Oral Arg. at 9.

Again, the record indicates a lack of agreement between plaintiff, which argues that customers such as Verizon may use the products that comprise the subject merchandise in a variety of ways, Pl. Br. at 30, while defendant asserts that to the extent telephone providers such as Verizon use those products, the providers use them primarily to provide "IP T.V." services.  Def. Ex. 3 (Armstrong Dep.) at 27, 29, 46, 54-56.

The court next considers whether Heading 8525 is the appropriate classification in respect of the language of "transmission" in the heading.  For example, Brydon clarified in a declaration that the Harmonic EMRs "deliver" a signal.  He stated that "in cable or satellite delivery applications modulation and transmission equipment is required after the encoder, multiplexer or remultiplexer to enable the signal to be delivered over the access medium.  Similarly, in an IPTV application *the encoder, multiplexer or remultiplexer delivers the signal* to a DSLAM (Digital Subscriber Line Access Multiplexer) that then transmits the signal to multiple subscribers over the telephone network to the consumer reception equipment."  Pl. Ex. D (Brydon Declaration) at ¶ 6 (emphasis supplied).

In sum, the parties do not dispute the conclusion that Harmonic EMRs send signals to other equipment within the path of transmission, such as a modulator, while not sending signals to a final receiving device.  *See* Def. Ex. 3 (Armstrong Dep.) at 26-28; *see also* Pl. Rep. Br. at 9-10.  This type of activity meets the established interpretation of "transmission apparatus" because the Harmonic EMRs are "apparatus that send a signal out to another location."  *See* discussion of dictionary definitions and common meaning of "transmission," *supra* p. 16-19.

However, the parties dispute the principal use of the subject merchandise, a material fact that affects the outcome of this case.  *See Anderson*, 477 U.S. at 248. USCIT Rule 56(a) provides that the court grant summary judgment only if a moving party can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Accordingly, since plaintiff has failed to meet its burden in this respect, the court does not reach a conclusion as to whether the subject merchandise is properly classified at Headings 8529 and 8525.

### 2.  Heading 8517

The relevant part of Heading 8517 describes properly classified items as "other apparatus for the transmission or reception of voice, images or other data, including apparatus for communication in a wired or wireless network (such as a local or wide area network), other than transmission or reception apparatus of heading . . . 8525." Plaintiff argues that the Harmonic EMRs are properly classified in Heading 8517 because the devices are used for a variety of purposes, including non-television. Plaintiff relies on the Schonfeld Expert Report to support this assertion.  Tr. Oral Arg. at 26, 28.  The report states that the "Harmonic encoders, multiplexers, and re-multiplexers were intended for use in . . . multimedia *communication* networks."  Pl. Ex. F (Schonfeld Expert Report) at 5.  Earlier, the report describes multimedia communication networks as providing "a variety of digital services to their customers, including telephony, television, and Internet services."  *Id*.  The report also states that "[t]he strong relationship between multimedia compression standards adopted for multimedia storage, video telephony and other networked applications such as

videoconferencing is a clear indication of the confluence of many of the technologies used for these very different multimedia applications."  *Id*. at 8.

However, as noted, Mr. Schonfeld stated during his deposition that he does not know how Harmonic EMRs are *actually* used.  *See* Pl. Ex. I (Schonfeld Dep*.*) at 128, 158.  In light of this statement, the explanation in the Schonfeld Expert Report about multimedia compression standards does not support plaintiff's argument that the Harmonic EMRs that incorporate the subject merchandise are used *principally* for telephone and Internet networks.  Rather, this statement conveys that the technology used to compress data for movie and television viewing is similar to that used for video telephony and videoconferencing.  As a consequence, the Schonfeld Expert Report leaves unclear the principal use to which the Harmonic EMRs, with which the imported merchandise is used, are put: namely, for television or non-television purposes.

## CONCLUSION

Much has been written about the "Golden Era of Television."  The court is not in a position to offer a judgment on when, exactly, that era may have started and ended.

However, without question, one of the greatest shows in television history, punctuated by the use of a Shoe Phone, appropriately, was the comedy-action-adventure series *Get Smart*, created by the extraordinary Mel Brooks and Buck Henry, as a spoof of the James Bond movies.  The show featured a memorable series of gadgets, which included the Shoe Phone (Agent Maxwell Smart, played by Don Adams, had to remove his shoe and hold the bottom of it up to his cheek and ear) and the Cone of Silence (comprised of two clear, semi-circular sheets of translucent plastic that descended from the ceiling to create a 1960s version of a Sensitive Compartmentalized

Information Facility ("SCIF").  Smart insisted on using it to convey the most rudimentary and useless information to his superior — known simply as "The Chief," played to comic perfection by Edward Platt — and it invariably malfunctioned, bonking Smart or the Chief on the head or causing other problems).[12]

The show also included catchphrases that caught on quickly at the time and were widely repeated.  There was "the old [fill-in-the-blank] trick" catchphrase, as in: "The old Professor Peter Peckinpah all-purpose anti-personnel Peckinpah pocket pistol under the toupee trick."[13]

And, then there was the "would you believe" catchphrase, as in one instance in which an evil character known as Mr. Big captures Smart and his partner, Agent 99, played by Barbara Feldon:

Smart: "At the moment, seven Coast Guard cutters are converging on us.  Would you believe it?"

Mr. Big: "I find that hard to believe."

Smart: "Would you believe six?"

Mr. Big: "I don't think so."

Smart: "How about two cops in a rowboat?"[14]

---

[12] *Get Smart*, WIKIPEDIA, https://en.wikipedia.org/wiki/Get_Smart (last visited Dec. 16, 2020).

[13] Catchphrases, WOULDYOUBELIEVE.COM, http://www.wouldyoubelieve.com/phrases.html (last visited Dec. 16, 2020).

[14] *Get Smart: Mr. Big* (NBC television broadcast Sept. 18, 1965).

As Mel Brooks said at the time: "I was sick of looking at all those nice, sensible situation comedies.  They were such distortions of life.  No one had ever done a show about an idiot before.  I decided to be the first."[15]

The court trusts that its analysis will be considered to be neither idiotic nor a distortion of the facts and law in this case.  For the foregoing reasons, the court grants defendant's motion to dismiss for lack of subject matter jurisdiction as to Entry No. UPS-8221052-5, and judgment will be entered accordingly.  With respect to all other entries at issue in this action, the court denies plaintiff's Rule 56 motion for summary judgment and denies defendant's Rule 56 cross-motion for summary judgment.  Instead, the court grants partial summary judgment in favor of defendant on issues relating to the proper meaning of the terms in Heading 8517 and Heading 8525.  The parties shall submit within 30 days of the date of this opinion a proposed scheduling order that includes (1) a date for submission of the order governing preparation for trial, (2) a date for the submission of the pretrial order, (3) a date for the pretrial conference, and (4) a proposed trial date on or before March 1, 2021, on the issue of the principal use of the subject merchandise.

/s/ Timothy M. Reif
Timothy M. Reif, Judge

Date:   December 22, 2020
        New York, New York

---

[15] Smart Money, TIME MAGAZINE, Oct. 15, 1965, at 109.

52